# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KEEN EDGE COMPANY, INC.,

               Plaintiff,

v.

WRIGHT MANUFACTURING, INC.,

               Defendant.

Case No. 19-CV-1673-JPS

**ORDER**

On November 13, 2019, Plaintiff Keen Edge Company, Inc. ("Keen Edge") filed this breach of contract case in federal court pursuant to 28 U.S.C. § 1332, alongside a motion for a temporary restraining order and a preliminary injunction. (Docket #1, #2). The case was transferred to this branch of the Court on March 31, 2020. (Docket #34). Defendant Wright Manufacturing, Inc. ("Wright") opposed the motion for a temporary restraining order and a preliminary injunction, which is now fully briefed. For the reasons explained below, the motion for a temporary restraining order and a preliminary injunction order will be granted.[1]

## 1.    LEGAL STANDARD

"[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quotation omitted). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct

---

[1]In the course of its briefing, Wright filed a motion for leave to file excess pages. (Docket #29). The Court will grant this motion.

phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). In the "threshold phase," the Court must determine if the movant has met its burden to establish that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* (internal citations omitted). If the party seeking a preliminary injunction fails to satisfy its obligation to demonstrate any of these elements, the Court should not grant the injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). And, only in the event that "the [C]ourt finds that the moving party has passed this initial threshold, [will] it then proceed[] to the balancing phase of the analysis." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

"In this second phase, the court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the [movant]'s injury, the likelihood of prevailing at trial, the possible injury to the [non-movant] if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (internal citation omitted)). "Specifically, the [C]ourt weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the [C]ourt were to grant the requested relief." *Id.* (citing *Abbott Labs.*, 971 F.2d at 11–12). This process involves engaging in what the Court of Appeals terms "the sliding scale approach; the more likely the [movant] will succeed on the merits, the less the balance of irreparable harms need favor the [movant's] position." *Ty,*

*Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "[T]his balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Id.* (quoting *Lawson Prods.*, 782 F.2d at 1436).

## 2. RELEVANT FACTS

Keen Edge is a citizen of Illinois and an engine and parts supplier. Shortly after the company's creation in 1951, a businessman by the name of Robert Burke bought out one of the cofounders. By 1985, the Burke family had taken full ownership of the company. That year, William Burke ("Burke") became the president of Keen Edge. Various Burke family members continue to work in a leadership capacity at Keen Edge.

Wright is a Maryland-based facility that manufactures lawnmowers. Immediately upon its creation in the 1980's, Wright partnered with Keen Edge to distribute its products. In 1997, Keen Edge began distributing Wright's state of the art "Stander" line of lawnmowers throughout the Midwest, including in Wisconsin. Keen Edge was tasked with "educating retailers and their customers about the features and benefits of the Stander line," an effort that created "a market that now accounts for a substantial portion of Wright Manufacturing's business." (Docket #3 at 2). These efforts won Keen Edge the "exclusive territory to sell Wright Manufacturing products" in "Wisconsin, the Chicagoland area of Illinois, northwest Indiana, Minnesota, North Dakota, most of Missouri, and eastern Kansas."

(*Id.* at 2–3). Keen Edge employs a handful of other dealers or salespeople throughout its territory.

Although no written contract was ever created, Wright held Keen Edge to certain obligations in exchange for certain privileges. For example, as part of the exclusivity agreement, Keen Edge was held to an annual sales growth goal of 10–15 percent each year. Similarly, Keen Edge had permission to use Wright's trademarks in advertisements and promotions, but was required to abide by certain rules of selling and marketing Wright products. Additionally, in exchange for selling Wright products, Keen Edge was required to contribute to rebate funds and invest in specific inventory. On the whole, Wright products constitute a significant part of Keen Edge's business. In 2019, "Wright products accounted for almost 95 percent of Keen Edge's total sales." (*Id.*) Over half of Keen Edge's employees "dedicate 100 percent of their time" to Wright products. All Keen Edge employees are trained in using and promoting Wright products.

Keen Edge's primary facility is in Illinois, where eight of its less-than-a-dozen employees work. Keen Edge also has a distribution facility in Lake Geneva, Wisconsin, (the "Wisconsin facility"), which employs one person full-time, i.e., its president, Burke. Keen Edge does not have any facilities in any other state, though it does have salesmen and customers throughout its territory. It is from the Wisconsin facility that Keen Edge distributes "more than two-thirds of the Wright Manufacturing products it sells," (*id.*), though actual orders are routed through Illinois. Keen Edge sells approximately 20 percent of its Wright products to Wisconsin purchasers. Consistent with this, Keen Edge spends around 20 to 25 percent of its time and efforts recruiting and fulfilling Wisconsin sales. Keen Edge spent over $1.2 million to lease the Wisconsin facility, and has spent

Case 2:19-cv-01673-JPS   Filed 08/21/20   Page 4 of 18   Document 38

hundreds of thousands of dollars marketing and advertising Wright products by way of its website, its trucks, and its trailers across the Midwest, including a substantial portion in Wisconsin. (*Id.*)

In early 2019, the Wright company experienced a change in leadership. The founder's son, Ed Wright, took the helm of the ship, and, in April 2019, visited Keen Edge's Illinois office with some performance complaints. On May 30, 2019, Wright followed up with a letter that claimed Keen Edge was "underperforming" and "in default of the requirements to be a Wright distributor." (Docket #1-1 at 2–3). The letter identified sixteen areas of improvement. The letter provided that a failure to resolve the deficiencies might result in termination of the "distributorship and discontinuance of our business relationship." (*Id.* at 3). The letter further specified that Wright would follow up with a progress visit. (*Id.* at 4).

On June 24, 2019, Keen Edge employees met with the Wright staff to address the purported deficiencies in the letter. At the meeting, Keen Edge expressed its concern with the necessity and practicality of some of the recommended solutions, and noted that other distribution centers were not held to these requirements. In response, Wright suggested that Keen Edge could sell its business to a competitor. Since this was not an option for Keen Edge, it responded to Wright's suggested changes with alacrity.

Wright never conducted a follow-up visit to assess Keen Edge's progress. Throughout the summer of 2019, Keen Edge continued to fulfill its duties as a distributor, including attending the annual general meetings and territory manager meetings, drafting a sales and marketing budget for 2020, and proposing dealer program terms, which Wright accepted on August 21, 2019.

Then, on October 11, 2019, Wright gave notice that it was going to terminate Keen Edge's dealership within 30 days—effective November 10, 2019. Wright did not provide a clear reason for the termination; it only made general reference to the deficiencies identified in the May 30, 2019 letter. Wright did not give Keen Edge the opportunity to cure any perceived deficiencies.

## 2. ANALYSIS

### 2.1 Irreparable Harm and Inadequate Remedies at Law

This case arises out of an alleged violation of the Wisconsin Fair Dealership Law ("WFDL"), which presumes irreparable harm if violated. Wis. Stat. § 135.065 ("In any action brought by a dealer against a grantor under this chapter, any violation of this chapter by the grantor is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued."); *see also Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1075–76 (E.D. Wis. 2007) (explaining that irreparable harm with inadequate remedy at law occurs if a plaintiff "becomes insolvent or loses its business"); *c.f. Roland Mach.*, 749 F.2d at 391 (finding that a 24 percent loss in revenue would be "painful" but "not fatal.").

Keen Edge contends that it will lose some 95 percent of its business if the injunction is not granted. It has supported this assertion with deposition testimony from its president, Burke. Wright does not actually dispute that Keen Edge will suffer irreparable harm, specifically in the form of losing 95 percent of its business, if relief is not granted. Rather, Wright's arguments hinge on whether Plaintiff will succeed on the merits. In light of its undisputed showing that it stands to lose 95 percent of its business, the

Court finds that Plaintiff has adequately demonstrated irreparable harm with an inadequate remedy at law.

## 2.2 Likelihood of Success on the Merits

In order to win a preliminary injunction, the movant must show a "better than negligible" chance of success on the merits. *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.* 846 F.2d 1079, 1084 (7th Cir. 1988). In this case, the parties dispute whether Keen Edge is a business that is "situated in" Wisconsin, and whether Keen Edge and Wright have a "community of interests," such that the WFDL applies.[2] The parties also dispute whether Wright has shown good cause to terminate its dealership, and that it terminated the dealership with proper notice. Each issue will be assessed in turn.

### 2.2.1 WFDL Applicability to Keen Edge

The WFDL is a trade law that protects dealerships from the sudden or otherwise improper termination of their contract with the person who granted the dealership (the "grantor"). Wis. Stat. §§ 135.02(5); 135.04. A dealership is "a contract or agreement. . .between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise." *Id.* § 135.02(3)(a). There are two oft-litigated provisions in the WFDL, each of which are at issue here: first,

---

[2]Wright does not directly address the "community of interests" issue in its opposition, but relies on the similarities between the "situated in" and "community of interests" analyses in framing its argument regarding whether Keen Edge is "situated in" Wisconsin. In the interest of thoroughness, the Court will address both issues.

Case 2:19-cv-01673-JPS   Filed 08/21/20   Page 7 of 18   Document 38

whether the business relationship at issue is a "dealership" that is "situated in Wisconsin,"; and, second, whether the dealer and the grantor share a "community of interests" sufficient to trigger application the WFDL. Each argument is analyzed below.

### 2.2.1.1      "Situated in" Wisconsin

The WFDL asks "whether the business relationship at issue can be said to be situated in this state." *Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 150 (Wis. 2000) ("*Baldewein I*"). Wisconsin sales alone, while important, are not dispositive. *Id.* at 151–52. Courts are advised to consider, among other factors:

> 1) percent of total sales in Wisconsin (and/or percent of total revenue or profits derived from Wisconsin); 2) how long the parties have dealt with each other in Wisconsin; 3) the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin; 4) the extent and nature of the grant of territory in this state; 5) the extent and nature of the use of the grantor's proprietary marks in this state; 6) the extent and nature of the dealer's financial investment in inventory, facilities, and good will of the dealership in this state; 7) the personnel devoted to the Wisconsin market; 8) the level of advertising and/or promotional expenditures in Wisconsin; and 9) the extent and nature of any supplementary services provided in Wisconsin.

*Id.* at 152.

*Baldewein Co. v. Tri-Clover, Inc.*, 183 F. Supp. 2d 1116 (E.D. Wis. 2002) (*Baldewein II*) is the federal companion case which prompted the Seventh Circuit to certify the "situated in" question that the Wisconsin Supreme Court addressed in *Baldewein I*. With the guidance of the factors set forth in *Baldewein I,* the district court in *Baldewein II* found that a dealership that only had *de minimis* contact with the state of Wisconsin was not "situated

in" Wisconsin for the purposes of the WFDL. For example, in *Baldewein II,* the purported dealer had an extremely low level of Wisconsin sales for the first 51 years of the dealership (i.e., initially hovering around .5 percent, but never more than 7.3 percent of total sales); the dealer did not keep significant inventory in Wisconsin; there was a non-exclusive grant of territory; the dealer's advertisement efforts in Wisconsin were not significant compared to other states; the dealer had no facilities in Wisconsin; and the dealer only provided services in proportion to its sales in Wisconsin, which were already quite low. 183 F. Supp. 2d at 1120–25. On those facts, the balance weighed against finding that the dealership was "situated in" Wisconsin.

By contrast, here, each of the factors weigh in favor of finding that Keen Edge is situated in Wisconsin for the purpose of WFDL application. For approximately two decades, Keen Edge has distributed Wright products almost exclusively in the Midwest, with most of its inventory based in Wisconsin. The Court infers that Keen Edge has been operating out of its Wisconsin facility—its only other facility in the Midwest—for much, if not all, of last two decades. Wisconsin constitutes a 20 to 25 percent share of Keen Edge's sales efforts, and Keen Edge devotes approximately 20 percent of its resources advertising and promoting Wright's products in Wisconsin. Thus, Wisconsin is hardly a *de minimis* portion of Keen Edge's revenue, regardless of what Wright believes. *C.f. id.* at 1120 (finding minimal sales where Wisconsin sales averaged 4 percent of the movant's total sales over the course of five years).

While there are not many obligations imposed on the operations in Wisconsin, it appears that Keen Edge is partially responsible for maintaining rebate funds, keeping certain supplies and parts on hand,

meeting sales goals, and stocking a certain amount of inventory. As for the nature and grant of territory, Keen Edge has an exclusive right to sell Wright products in Wisconsin, and uses Wright's proprietary marks to advertise Wright products in Wisconsin. Since Wisconsin constitutes at least 20 percent of Keen Edge's sales efforts, the fact that these promotional efforts were not specifically directed at Wisconsin citizens is less of a concern than it was in *Baldewein II*. There, Wisconsin sales were so low that in order for any factor to be relevant, it would have had to be specifically focused on Wisconsin. *Id.* at 1121 (noting that "the higher the percentage of Wisconsin sales. . .the less important the other indicators of investment become.") (citations and quotations omitted). By contrast, here, Wisconsin constitutes a large enough portion of sales such that any concern about directing the efforts specifically within Wisconsin is mitigated. And even still, there are considerable indications of investment in Wisconsin. For example, Keen Edge spent 1.2 million dollars on the Wisconsin facility, and continually ensures that it retains enough Wright inventory at the warehouse to fulfill more than two-thirds of its orders.

The WFDL is intended to remedy situations where a dealer's "sizable investment is not fully recoverable." *Id.* at 1123 (citations and quotations omitted). Thus, Wright argues that its inventory is not valueless if the contract is terminated, because Keen Edge could sell to customers outside of (and presumably, within) Wisconsin. This is disingenuous. If Keen Edge is no longer an exclusive dealer of Wright products for a given territory, and if it no longer has Wright's backing for up-to-date replacement parts, training, warranties, and so forth, then its inventory will dwindle in value—and once sold off, Keen Edge would cease to be in business.

Case 2:19-cv-01673-JPS   Filed 08/21/20   Page 10 of 18   Document 38

Additionally, while only one employee works at the Wisconsin warehouse, he is perhaps the most visible and consequential employee at the company, i.e., its president, Burke. There is also some evidence that Burke's grandson occasionally works at the Wisconsin facility. *See e.g.*, (Docket #30-2 at 11:4–16) Finally, Keen Edge provides supplementary services such as consultations and service parts free of charge to Wisconsin customers in proportion to their share of sales—approximately 20 percent.

The foregoing analysis demonstrates that Keen Edge has a significant presence in Wisconsin. Keen Edge does a substantial portion of its business in Wisconsin; it is partially located in Wisconsin; and it has spent a considerable amount of time, money, and other resources in building business in Wisconsin—both its own, and Wright's. Thus, protection under the WFDL is proper.

### 2.2.1.2 "Community of Interests"

A "'community of interests' means a continuing financial interest between the grantor [of the dealership] and grantee [i.e., the dealer] in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. § 135.02(1). "[P]arties to a dealership must exhibit shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship." *Ziegler Co., Inc. v. Rexnord, Inc.*, 407 N.W.2d 873, 879 (Wis. 1987). The "goals and efforts" of the parties "must not simply be coextensive"; rather, they must reflect "interdependence" of the two parties, such that they cooperate, coordinate, and share common goals within a business relationship. *Id.* The key issue is whether the dealer can "demonstrate a stake in the relationship large enough to make the grantor's power to terminate. . . a threat to the economic health of the

person (thus giving the grantor inherently superior bargaining power)." *Id.* at 873.

Courts consider the following factors when determining whether parties have a "community of interest": (1) "how long the parties have dealt with each other"; (2) "the extent and nature of the obligations imposed on the parties in the contract"; (3) "what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services;" (4) "what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services"; (5) "the extent and nature of the alleged grantor's grant of territory to the alleged dealer"; (6) "the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos)"; (7) "the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership"; (8) "the personnel which the alleged dealer devotes to the alleged dealership"; (9) "how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services;" and (10) "the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services." *Id.* at 879–80.

These factors, too, weigh in favor of applying the WFDL. Keen Edge and Wright have been in business together for nearly forty years, and Keen Edge has had territorial exclusivity to sell Wright products to great swaths of the Midwest for the better part of two decades. Keen Edge also sells Wright products almost exclusively, and provides training, repairs, alternate parts, and rebate funds to purchasers—thus, what is good for Wright's business is good for Keen Edge's business. Accordingly, Keen Edge conducts advertising and promotions on Wright's behalf, attends

annual meetings, and drafts budgets for Wright's review. By all accounts, Keen Edge devotes the vast majority of its resources to Wright products, and nearly all of its profits are derived from these sales—some 95 percent of its business is from Wright products, 92 percent of its gross profits derive from Wright products, and a comparable proportion of Keen Edge staff are trained exclusively in Wright products. These factors clearly demonstrate a community of interests such that the WFDL would apply. *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 399 (7th Cir. 1992) (holding that a community of interests exists when either a large proportion of revenues are derived from the dealership or when the dealer has made a "sizable investment" in the dealership, or some combinations thereof).

### 2.3 Proper Notice and Good Cause

The WFDL provides, in relevant part, that "a grantor shall provide a dealer at least 90 days' prior written notice of termination. . . The notice shall state all the reasons for termination. . . and shall provide that the dealer has 60 days in which to rectify any claimed deficiency." Wis. Stat. § 135.04. It further instructs termination must be for "good cause," which may arise in the event of a "[f]ailure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement." Wis. Stat. § 135.02(4)(a). A notice of termination should "clearly. . .articulate" the ways in which the dealer failed to comply with the reasonable requests of the grantor. *Al Bishop Agency, Inc. v. Lithonia-Div. of Nat'l Serv. Indus., Inc.*, 474 F. Supp. 828, 833–35 (E.D. Wis. 1979) (holding that notice must be practical, i.e., provide enough time for plaintiff to

remedy deficiencies, and defendant must actually monitor plaintiff's efforts).

Here, Wright began the proper termination procedures with a letter dated May 30, 2019 which delineated sixteen clear—but contested—areas of improvement. This meant that Wright could have terminated the contract under the WFDL no earlier than August 18. Moreover, Wright was required to give Keen Edge until July 29, at minimum, to cure the deficiencies. The parties met on June 24, within the 60-day cure period, to discuss the requested changes and, after some discussion, Keen Edge began implementing the proposed changes. However, in the period following the June 24 meeting, Wright never followed up with Keen Edge's progress, never visited the Wisconsin facility (which it claimed was too small to support its inventory), and did not give any indication that Keen Edge was still underperforming or otherwise failing to make the requested changes. Instead, Wright demonstrated a willingness to continue the dealership: it accepted Keen Edge's proposed budget for the following year, hosted Keen Edge's employees at various meetings, and, on August 21, approved another of Keen Edge's proposed dealer agreements.

The Court would need to employ an extremely parsimonious reading of Wis. Stat. § 135.04 in order to find that Wright's October 11 termination letter was consistent with the 90-day notice provision and the 60-day cure period, and the Court declines such an approach. *See Al Bishop Agency*, 474 F. Supp. at 834–35. In light of the fact that Wright failed to monitor Keen Edge's progress after the May 30 letter, together with the fact that Wright acted in ways that are wholly inconsistent with an intent to terminate the contract in the months after the May 30 notice, the Court cannot find that the October 11 termination was proper.

Moreover, there is no evidence of good cause here. The reason for a dealership termination must be "objectively ascertainable," proportionate, and non-discriminatory. *Morley-Murphy Co. v. Zenith Elec. Corp.*, 142 F.3d 373, 378 (7th Cir. 1998) (citing *Ziegler Co.*, 433 N.W.2d at 13). Here, the reasons for the termination are inconsistent with the parties' actions and potentially pretextual. For example, Wright's concern that Keen Edge's facilities were not large enough to handle the inventory was apparently baseless, as it had never visited the Wisconsin facility. Keen Edge invited Wright to visit and confirm its size; however, no visit was made. Moreover, when faced with Keen Edge's concerns over the May 30 letter, Wright suggested that Keen Edge sell to a competitor. Finally, it seems that not all of these requirements were imposed on other dealers. *See Builder's World*, 482 F. Supp. 2d at 1075 (finding no good cause where there was some evidence of possible discrimination).

### 2.4    Other States Law Claims

Having determined that Keen Edge has a likelihood of prevailing on the merits of its WFDL claim, the Court similarly finds that the corollary claims brought under Illinois, Indiana, North Dakota, Missouri, and Minnesota law show some merit. All of these states have protective trade statutes that contain comparable requirements of dealers/grantors, and analogous language requiring termination for good cause.

Wright raises certain minor concerns with each of these statutes, which do not warrant considerable discussion at this juncture. For example, Wright takes issue with whether it can be truly considered a "franchiser" under the Illinois Franchise Disclosure Act ("IFDA") or the Indiana Deceptive Franchise Practices Act ("IDFPA") because, it contends, it does not require a franchise fee. Keen Edge counters that a franchise may exist

under the IFDA where the franchise fee is paid indirectly (i.e., through rebate programs and inventory stock requirements). 815 ILCS 705/3(14); *see also* Ind. Code § 23-2-2.5-1(i) (explaining that a franchisee may be "required to pay directly or indirectly for the right to conduct a business"). Wright also contends that the North Dakota statute applies only to individuals who conduct business in North Dakota; Keen Edge points out that it *does* do business in North Dakota. *See* NDCC 51.07.01.1; (Docket #37 at 14 n.7).

Similarly, there are allegations in the complaint suggesting that Keen Edge conducts business in Minnesota, *see* (Docket #1 ¶¶ 4, 13, 15), and there is some evidence that Keen Edge has an employee in Minnesota, sufficient to put it under the purview of the Minnesota Franchise Act. Minn. Stat. Ann. § 80C.19 sub.1. Finally, Wright contends that the Missouri Act only applies to wholesalers and distributors that "maintain a stock of parts or complete or whole machines or attachments" *in the state of Missouri*; however, the statute contains no such geographic limitation as to distributors, and Wright does not point to any case law that suggests such a limitation. V.A.M.S. Sec. 407.895; (Docket #30 at 26). Rather, the statute explains that it does not apply to: "any distributor who distributes solely within the state of Missouri *and* who employs less than five employees for the two-year period prior to the dealer termination . . ." V.A.M.S. § 407.897. Keen Edge does not meet these criteria; therefore, it appears that the statute applies to Keen Edge.

There is, however, one exception. It appears that K.S.A. § 16-1401 *et seq.* clearly and only applies to retailers who serve the "ultimate customer." K.S.A. § 16-1401(b)(1). As a wholesaler, Keen Edge does not fall under this provision. Thus, the Court declines to grant the injunction as to Kansas.

Defendant finally argues that the injunction should only apply to the state of Wisconsin, in light of the Seventh Circuit's determination that the WFDL does not apply extra-territorially on the issue of damages. *Morley-Murphy Co.*, 142 F.3d at 381. The Court finds *Morley-Murphy* inapposite. As the preceding paragraph explains, it is plausible that Keen Edge could succeed on the likelihood of the merits in its corollary fair dealership claims, each of which would support an injunction in their respective states, with the exception of Kansas. Thus, at this stage, the Court finds that the requested preliminary injunction is generally appropriate, but will limit it so that it does not apply to Kansas.

### 2.5 Balancing the Equities

The Court now turns to the final inquiry, which is whether "the balance of harms favors [the plaintiff] or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016). In this case, absent an injunction, Keen Edge will suffer a dramatic loss in business, but Wright will not suffer harm—indeed, Keen Edge will continue to represent Wright's interests, and do its best to sell Wright's products, in light of their community of interest. Additionally, the public interest is served by the preliminary injunction, which protects the "fair business relations between dealers and grantors" as envisioned by Wis. Stat. § 135.025(2)(a), as well as Keen Edge's customers. Therefore, the equities weigh in favor of issuing the injunction.

### 3. CONCLUSION

For the reasons explained above, the Court will grant the motion for a temporary restraining order and a preliminary injunction. In light of the COVID-19 pandemic, a trial scheduling order will not be entered until such

a time as circumstances warrant. The parties may engage in discovery and motion practice absent such an order, but they are advised that the Court does not concern itself with discovery squabbles, and any such matters will be referred to the assigned magistrate judge for disposition.

Accordingly,

**IT IS ORDERED** that Keen Edge Company, Inc.'s motion for a preliminary injunction and a temporary restraining order (Docket #2) be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that Wright Manufacturing, Inc.'s motion for leave to file excess pages (Docket #29) is **GRANTED;**

**IT IS FURTHER ORDERED** that Wright Manufacturing, Inc. is temporarily restrained from proceeding with the planned termination of Keen Edge Company, Inc.'s distributorship; and

**IT IS FURTHER ORDERED** that the status quo in Keen Edge Company, Inc.'s exclusive territory for Wright Manufacturing, Inc. sales, including with respect to the procedures and course of dealing followed by the parties over the purchase of products and parts necessary to allow Keen Edge Company, Inc. to continue to do business as the exclusive distributor for Wright Manufacturing, Inc. in the territory implicated by this action, with the exception of Kansas, is hereby preserved pending further action by this Court.

Dated at Milwaukee, Wisconsin, this 21st day of August, 2020.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge